1

2

3

4

5

6

7

8                                  UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ALBERT A. DENNIS,                             No.  2:13-cv-0278 WBS CKD P

12                  Petitioner,

13         v.                                      FINDINGS AND RECOMMENDATIONS

14   WARDEN, HIGH DESERT STATE
     PRISON,
15
                    Respondent.
16

17          Petitioner, a state prisoner, is proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury of first degree murder and

19   related offenses in 2010.  He claims that the trial court erroneously and prejudicially allowed a

20   recording of the victim's 911 call to be played for the jury, violating his federal right to due

21   process.[1]  (ECF No. 1.)  Respondent has filed an answer.  (ECF No. 10.)  Upon careful

22   consideration of the record and the applicable law, the undersigned will recommend that the

23   petition be denied.

24   ////

25   ////

26

27   _____
     [1] In screening the petition, the undersigned determined that "Claims 2 and 3 of the petition allege
     violations of state law which are not cognizable on federal habeas review."  (ECF No. 4 at 2.)
28   Thus a response was ordered only as to Claim 1, addressed herein.

                                                    1

BACKGROUND

I. Facts

        In its affirmation of the judgment on appeal, the California Court of Appeal, Third

Appellate District, set forth the relevant factual background as follows:

> Kelly Strong, Linda Saelee and the victim, Amber Manoa, knew each other through dating and drug deals. Strong had introduced Saelee to Manoa during a drug deal where they exchanged $50 of methamphetamine for Saelee's cell phone. Manoa used the cell phone to call Saelee's drug contacts, informed them Saelee was no longer selling drugs and made sales herself. Strong cautioned her against doing this. Saelee was angry about this and wanted her cell phone back.

> Tonisha Elder and her live-in boyfriend, defendant, lived around the corner from Saelee. The trio had been together when they decided to buy drugs from Manoa. Saelee called Manoa and arranged to purchase $50 of methamphetamine from her. They agreed to meet at Saelee's apartment. Defendant told Elder he was going to wait for Manoa, scare her and steal her drugs. He had a gun he was going to use to scare her, but no one was supposed to be killed or injured. Saelee and Elder went to Saelee's apartment and defendant left. At about 1:00 a.m., Elder met defendant and gave him a bottle of gin. Elder last saw defendant walking toward their apartment wearing jeans, a white shirt and a black hooded sweatshirt.

> Manoa and Strong met and headed to Saelee's apartment for the drug deal at about 4:00 a.m. Elder and Saelee did not have enough money to buy the $50 of methamphetamine. Manoa appeared uncomfortable with Saelee. She asked Strong if Saelee had ever been "janky," or dishonest about a transaction. Elder then purchased $20 of methamphetamine from Manoa.

> Manoa and Strong left the apartment and returned to the car. As they were getting in, Strong saw a male dressed in a long-sleeved hooded sweatshirt, a baseball cap, gloves and a ski mask run up from behind them and fire a gun at them. Strong was shot in the foot and fell into the passenger seat. The shooter fired more shots while standing in the passenger side door jamb. He leaned over Strong, hit him with the gun and demanded, "Where's it at?" "Where's it at?" "Give it up." Strong told the shooter he did not have anything. The shooter appeared focused on Manoa, and ran behind the car to the driver's side, where Manoa was. This gave Strong the chance to get away. He crawled away from the car, climbed a fence and hid. He heard more shots fired, got up and ran farther away. Eventually he stopped at a house and asked them to call an ambulance.

> A number of neighbors heard the gunshots as well. Joel Perez looked out his window when he heard the shots. He saw one man holding a gun and shooting at another, who was running away. The shooter was wearing a black hooded sweatshirt pulled up over his

head, with the sleeves pulled down over his hands. After briefly following the fleeing man, the shooter returned to the car, aimed his gun at the crying woman in the driver's seat, and shot her four or five times.

Freddy Lara heard two men fighting. He saw one man pull out a gun and shoot the other, who was running away. The shooter was wearing black pants, a black shirt and a hood pulled over his head. After briefly pursuing the fleeing man, the shooter returned to the car and shot the woman in the parked car. He then turned back and jumped a fence.

Other neighbors heard arguing, then gunshots, screeching tires and a car taking off fast.

Descriptions of the shooter varied. Strong testified the shooter was light-skinned, "mixed-race, yellowish skin," the shooter's voice was deep, and he thought the shooter was about his height, between five feet 11 inches and six feet two inches. Defendant is actually a couple of inches shorter than Strong, his skin color different than Strong described and when played a tape of defendant's voice, Strong did not recognize it. Perez testified the shooter was about five feet tall and weighed about 170 pounds. Lara described the shooter as thin, between five feet seven inches and six feet with dark skin.

James Woodberry, a homeless man, was in a transient encampment set up in a vacant lot across from Saelee's apartment complex. He had taken both morphine and crack cocaine prior to the shooting. At about 1:00 or 2:00 a.m., he was awakened in the lot by an African–American man wearing dark clothing and a hoodie, smoking cigarettes, drinking alcohol and holding a firearm. The man was no taller than five feet 11 inches and of medium build. The man was pacing the fence line and appeared to be waiting to rob someone. He also threatened to shoot Woodberry. Later, Woodberry heard gunshots and the man was gone from the lot.

Manoa died of gunshot wounds. The fatal wound entered her outer left thigh and tore an artery and vein. She sustained two other potentially fatal wounds in the crease of her left thigh and lower abdomen and another on her left side which lacerated her kidney and entered her spinal cord. She sustained another more superficial bullet wound and had three deep contusions on her skull. She sustained a total of 18 gunshot wounds, with five initial entry wounds. The shots were fired from above and slightly behind her position seated in the driver's seat. Defendant's fingerprints were found on the exterior driver's side of Manoa's car at a downward angle. At the bottom of the window, where the frame meets the window, defendant's left palm print was found. There were over 120 fingerprints lifted from the car, 11 that were identified as known individuals. Many of the prints were not of sufficiently high quality to be compared with known prints.

Police found a pack of Newport cigarettes, the brand defendant smoked, and a gin bottle in the vacant yard. Defendant's

3

1
2

> fingerprints were not on either the cigarettes or the bottle. Defendant's DNA was found on the mouth of the gin bottle.

3

People v. Dennis, 2012 WL 32068, at **1-2 (Cal. App. 3 Dist. Jan. 6, 2012); see also ECF No.

4

10, Ex. A.  The facts as set forth by the state court of appeal are presumed correct.  28 U.S.C. §

5

2254(e)(1).

6

II.  Procedural History

7

On January 25, 2010, following a jury trial in the Sacramento County Superior Court,

8

petitioner was found guilty of first degree murder (Cal. Penal Code § 187(a)$^2$) and assault with a

9

firearm (§  245(a)(2)).  The jury also found true allegations that the murder was committed while

10

engaged in a robbery (§ 190.2 (a)(17)) and that petitioner personally discharged a firearm

11

(§ 12022.53(d)).  The trial court found that petitioner had a prior serious felony conviction

12

(§ 667(a)).  Petitioner was sentenced to life in prison with the possibility of parole on the murder

13

conviction, plus 25 years to life for the gun use enhancement and a total of 18 years for the

14

enhancements, all terms to run consecutively. (Lod. Doc. No. 2 , Clerk's Transcript on Appeal

15

(CT) 355, 375-77.)  See also Dennis, supra, 2012 WL 32068, at **2-3.

16

On January 6, 2012, the California Court of Appeal for the Third Appellate District

17

affirmed the judgment.  (Lod. Doc. 11.)  Petitioner filed a petition for review, which the

18

California Supreme Court denied on March 14, 2012 "without prejudice to any relief to which

19

defendant might be entitled after this court decides People v. McCullough, S192513.$^3$"  (Lod.

20

Docs. 12, 13.)

21

Petitioner filed the instant petition for federal habeas relief on February 13, 2013.  (ECF

22

No. 1.)

23

/////

24

/////

25

/////

26

_____

$^2$ All statutory references are to the California Penal Code unless otherwise indicated.

27

28

$^3$ People v. McCullough concerns a state law claim about the payment of jail fees, not at issue here.  (See ECF No. 1 at 27-28.)

1

ANALYSIS

2   I. AEDPA

3       The statutory limitations of federal courts' power to issue habeas corpus relief for persons

4   in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

5   Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

6
7
> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
8

9
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

10

11
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
12

13       As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

14   2254(d) does not require a state court to give reasons before its decision can be deemed to have

15   been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

16   Rather, "when a federal claim has been presented to a state court and the state court has denied

17   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

18   of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris

19   v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear

20   whether a decision appearing to rest on federal grounds was decided on another basis).  "The

21   presumption may be overcome when there is reason to think some other explanation for the state

22   court's decision is more likely." Id. at 785.

23       The Supreme Court has set forth the operative standard for federal habeas review of state

24   court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an unreasonable

25   application of federal law is different from an incorrect application of federal law.'"  Harrington,

26   supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000).  "A state court's

27   determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

28   jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing

5

1   Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "a habeas court must

2   determine what arguments or theories supported or . . . could have supported[] the state court's

3   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

4   arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id.

5   "Evaluating whether a rule application was unreasonable requires considering the rule's

6   specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

7   case-by-case determinations.'"  Id.  Emphasizing the stringency of this standard, which "stops

8   short of imposing a complete bar of federal court relitigation of claims already rejected in state

9   court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not

10  mean the state court's contrary conclusion was unreasonable."  Id., citing Lockyer v. Andrade,

11  538 U.S. 63, 75 (2003).

12          The undersigned also finds that the same deference is paid to the factual determinations of

13  state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

14  subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

15  decision that was based on an unreasonable determination of the facts in light of the evidence

16  presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

17  2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

18  factual error must be so apparent that "fairminded jurists" examining the same record could not

19  abide by the state court factual determination.  A petitioner must show clearly and convincingly

20  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

21          The habeas corpus petitioner bears the burden of demonstrating the objectively

22  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

23  Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

24  court's ruling on the claim being presented in federal court was so lacking in justification that

25  there was an error well understood and comprehended in existing law beyond any possibility for

26  fairminded disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  "Clearly established" law is

27  law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van

28  Patten, 552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not

6

1    qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established

2    law not permitting state sponsored practices to inject bias into a criminal proceeding by

3    compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards

4    does not qualify as clearly established law when spectators' conduct is the alleged cause of bias

5    injection).  The established Supreme Court authority reviewed must be a pronouncement on

6    constitutional principles, or other controlling federal law, as opposed to a pronouncement of

7    statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

8            The state courts need not have cited to federal authority, or even have indicated awareness

9    of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8.  Where the state

10   courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal

11   court will independently review the record in adjudication of that issue.  "Independent review of

12   the record is not de novo review of the constitutional issue, but rather, the only method by which

13   we can determine whether a silent state court decision is objectively unreasonable."  Himes v.

14   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

15          "When a state court rejects a federal claim without expressly addressing that claim, a

16   federal habeas court must presume that the federal claim was adjudicated on the merits – but that

17   presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct.

18   1088, 1096 (2013).  "When the evidence leads very clearly to the conclusion that a federal claim

19   was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of

20   the claim.  Id. at 1097.

21   II.  Petitioner's Claim

22          Petitioner asserts that the trial court's admission of "the agonal gasps and groans of the

23   dying murder victim – played for the jury on a 9-1-1 tape which the Court of Appeal found to be

24   irrelevant – resulted in a denial of due process and a fundamentally unfair trial because [it] should

25   have been excluded as unduly prejudicial under state law."  (ECF No. 1 at 14, citing Cal. Evid.

26   Code § 352.)  As recounted in the transcript of this brief phone call on the night of the murder, a

27   CHP operator and fire dispatch operator asked questions of the victim, who responded by gasping

28   repeatedly; she uttered no words before the call ended.  (Lod. Doc. 3, Clerk's Supp. Transcript

7

13-15.) Petitioner points out that the state court of appeal determined that the admission of the 911 recording was erroneous under state law. However, the state court further determined that the error was harmless.

In the last reasoned decision on this claim, the state court of appeal wrote:

> Defendant contends the trial court prejudicially erred in admitting the victim's 911 call, on which she could be heard gasping, moaning and taking her dying breaths. We agree the court erred in admitting the evidence, but find the error was not prejudicial.
>
> In his motions in limine, defendant moved to exclude the tape of Manoa's 911 call, contending it did not include any words or background information, only her gasping for air and moaning as she died. Defendant accepted the time of the call might be relevant, but the content of the call had no probative value and hearing the victim's "gasping could only stimulate sympathy and have an unfairly prejudicial impact" on the jury. The People offered the tape was relevant to "show the time that she was still alive after being shot several times.... She had enough dexterity in her to call 911 and sit and hold the phone and continue to stay alive. [¶] So, it's relevant for time line at what point she is able to make that call from her phone and the time in which she stayed alive before then being deceased when responding officers get there and contact her that she's closed up in her car, that nobody else comes up. [¶] You can hear nothing else except her gurgling. There is a time lapse between her being shot, the defendant fleeing from her car and responding officers get there. [¶] The condition of the car, her body, whether anybody else came up to her body, is relevant. So to play that tape to show no, it's her gurgling there's no one trying to help her, there's no door slamming, that's relevant. [¶] ... [I]t is an open line that stays open on her phone and so it's highly relevant to give the jury a glimpse into what was happening during the time that she's sitting in her car." The court found the evidence admissible.
>
> A trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time. (Evid. Code, § 352; People v. Riggs (2008) 44 Cal.4th 248, 290.) The fact that the evidence undermines or bolsters a party's position does not makes the evidence unduly prejudicial, it makes it relevant. By definition, all relevant evidence tips the scales of the balance in one direction or the other.
>
> (People v. Cudjo (1993) 6 Cal.4th 585, 609; Evid. Code, § 210.) Rather, evidence is unduly prejudicial when it "'uniquely tends to evoke an emotional bias against the defendant as an individual and ... has very little effect on the issues.'" (People v. Karis (1988) 46 Cal.3d 612, 638, italics added.) "''In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors'

emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose."'" (People v. Scott (2011) 52 Cal.4th 452, 491.)

In striking the balance between the probative and the unduly prejudicial, the court "should allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury.... On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed." (People v. Haskett (1982) 30 Cal.3d 841, 864.)

Here, the content of the 911 tape was not relevant to any material issue in dispute. It did not describe the scene of the murder. (People v. Roybal (1998) 19 Cal.4th 481, 516–517.)  Nor did the tape rebut any alternate theories offered by the defense.  (People v. Welch (1972) 8 Cal.3d 106, 116–117.) Unlike cases in which the 911 call from the crime scene is admitted, here, the tape did not provide any material background information.  Indeed, the only information to be gleaned from the tape was the time of the call and the fact of Manoa's death. This being a murder case in which Manoa's death was undisputed, her death was a fact already known. The time of the call was available from other, less inflammatory sources, "thus avoiding inflaming the passions of the jury by so vividly recreating the aftermath of the shooting.  Absent a good reason there was no need to 'fill the courtroom with [the victim's] groans[ ]' (People v. Love (1960) 53 Cal.2d 843, 857)" (People v. Farmer (1989) 47 Cal.3d 888, 907), gasps and gurgling dying breaths.

Accordingly, we find the trial court abused its discretion in admitting the 911 tape.  (See People v. Brady (2010) 50 Cal.4th 547, 575.) We do not, however, find the error was prejudicial. That is, there has been no showing that the error resulted in fundamental unfairness, and it is not reasonably probable the verdict would have been more favorable to defendant absent the error. (People v. Watson (2008) 43 Cal.4th 652, 686; People v. Partida (2005) 37 Cal.4th 428, 432, 439.)

Defendant's defense was primarily to try to implicate a third party, particularly Saelee and her boyfriend, Jason Brahan. He relied on inconsistencies in the witness descriptions of his clothing, that some of the physical descriptions matched Brahan more closely than him, the numerous fingerprints found in Manoa's car, and the fact that the shooting occurred in a high crime area. But, the evidence against defendant was strong. Defendant and his friends arranged a drug purchase from Manoa. Defendant planned to wait for Manoa to arrive to complete the drug transaction, scare her with a gun and steal her drugs. Before the shooting, a homeless man in a lot across from where the shooting occurred was awakened by a man in dark, hooded sweatshirt, smoking cigarettes, drinking a bottle of alcohol and holding a gun. Defendant's DNA was found on the mouth of the gin bottle in the vacant lot. Defendant was wearing clothing that

1
2
3
4

matched the description given by various eyewitnesses. Defendant's fingerprints and a palm print were found on the exterior driver's side of Manoa's car. The fingerprints were located in a position on the car that was consistent with where the shooter would have been standing. On this record, there is no reasonable probability that the jury would have reached a verdict more favorable to defendant if the 911 tape had not been admitted.

5   People v. Dennis, 2012 WL 32068, at **3-5.

6        The due process inquiry in federal habeas review is whether the admission of evidence

7   was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  See Romano v.

8   Oklahoma, 512 U.S. 1, 12–13 (1994).  "A habeas petition bears a heavy burden in showing a due

9   process violation based on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th

10  Cir. 2005).  The United States Supreme Court has "defined the category of infractions that violate

11  'fundamental fairness' very narrowly."  Dowling v. United States, 493 U.S. 342, 352 (1990).  In

12  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citation omitted), the Ninth

13  Circuit explained that:

14
15
16
17

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

18  Even if the trial court erred in allowing evidence to be admitted at trial, petitioner must show that

19  the admission of such evidence had a "substantial and injurious effect on the jury's verdict."  See

20  Plascencia v. Alameida, 467 F.3d 1190, 1203 (9th Cir. 2006) (applying Brecht v. Abrahamson,

21  507 U.S. 619 (1993) harmless error analysis to claim that admission of evidence was improper).

22        Errors of state law are not cognizable on federal habeas review.  Estelle v. McGuire, 502

23  U.S. 62, 68 (1991) (standard of review for federal habeas court "is limited to deciding whether a

24  conviction violated the Constitution, laws, or treaties of the United States.").

25        Here, petitioner has not established that the state court violated clearly established federal

26  law in admitting the 911 recording.  Nor has he shown that any such error had a "substantial and

27  injurious effect on the jury's verdict."  As set forth by the court of appeal, the evidence against

28  petitioner was strong, including his fingerprints on the outside of the victim's car, DNA evidence

1   placing him nearby, and evidence of his plan to arm himself and rob the victim.  The 911

2   recording was brief and virtually content-free, and there is no reason to believe it was a

3   substantial factor in the jury's decision to convict.  Thus petitioner is not entitled to habeas relief

4   on this basis.

5           Accordingly, IT IS HEREBY RECOMMENDED that:

6           1.  The petition for writ of habeas corpus (ECF No. 1) be denied; and

7           2.  This case be closed.

8           These findings and recommendations are submitted to the United States District Judge

9   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

10  after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within fourteen days after service of the objections.  The parties are

14  advised that failure to file objections within the specified time may waive the right to appeal the

15  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  Dated:  November 27, 2013

17                                                              _____
                                                                CAROLYN K. DELANEY
18                                                              UNITED STATES MAGISTRATE JUDGE

19

20

21  2 / denn0278.hc

22

23

24

25

26

27

28

                                                11